IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

H.H., ET AL., )
)
     Plaintiffs, )
)    NO. 3:25-cv-01360
v. )
)    JUDGE RICHARDSON
MARGIE QUIN, ET AL., )
)
     Defendants. )
)

## <u>MEMORANDUM OPINION</u>

Plaintiffs, H.H. ("Plaintiff H.H."), Kelli Hewitt ("Plaintiff Kelli Hewitt"), James Hewitt ("Plaintiff James Hewitt"), and Lacey Perry ("Plaintiff Perry"), initiated this lawsuit by filing a complaint (Doc. No. 1, "Complaint") in this Court, naming as Defendants Margie Quin ("Defendant Quin"),[1] Cole Law Group (hereinafter sometimes "Defendant CLG" or "CLG"), Andrew Goldstein ("Defendant Goldstein"), and  Leen Heresh ("Defendant Heresh"). Filed with the Complaint is the declaration of Plaintiff H.H. (Doc. No. 1-2, "H.H. Declaration"), the declaration of Plaintiff H.H.'s former counsel, Carly Gresham (Doc. No. 1-3, "Gresham Declaration"), the declaration of Plaintiff Kelli Hewitts's and James Hewitts's counsel, Ashley Abraham (Doc. No. 1-4, "Abraham Declaration"), and the declaration of Plaintiff Perry (Doc. No. 1-5, "Perry Declaration").

Now pending before the Court is a "Motion for a Temporary Restraining Order" (Doc. No. 3, "Motion") filed by Plaintiffs in connection with the Complaint. Supporting the Motion is a memorandum of law (Doc. No. 3-1, "Memorandum"). Via the Motion, Plaintiffs seek a temporary

---

[1] Defendant Quin is sued only in her official capacity as Commissioner of the Tennessee Department of Children's Services.

restraining order ("TRO") that would temporarily restrain Defendant Quin[2] "as Commissioner of . . . [the] Tennessee Department of Children's Services, her officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them," (Doc. No. 1-1 at 1-2), from, among other things, "(a) forcing, coercing, or manipulating [Plaintiff] H.H. to sign any immigration documents without the presence of his chosen counsel; (b) threatening [Plaintiff] H.H. with deportation, placement disruption, or any other retaliatory consequences for exercising his legal rights; (c) unlawfully denying [Plaintiff] H.H. access to legal counsel of his choice; (d) falsely imprisoning [Plaintiff] H.H. through physical restraint or preventing him from leaving meetings; and (e) systematically excluding family members or support persons requested by [Plaintiff] H.H. if not otherwise excluded by court order." (Doc. No. 3 at ¶ 7). Also via the Motion, Plaintiffs request a "hearing on Plaintiffs' request for injunctive relief at the Court's earliest convenience." (*Id.* at 3). Plaintiffs have also filed a proposed order (Doc. No. 1-1, "Proposed Order") reflecting the specifics of the injunctive relief they seek via the Motion.[3]

---

[2] Although the Motion contemplates "Defendants" being restrained, the Proposed Order makes clear that the relief sought is only against Defendant Quin "as Commissioner of . . . [the] Tennessee Department of Children's Services, her officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them." (Doc. No. 1-1 at 1-2).

[3] Plaintiffs move the Court for a "Temporary Restraining Order . . . pursuant to Federal Rule of Civil Procedure 65." (Doc. No. 3 at 1). Notably, however, where Fed. R. Civ. P. 65 refers to TROs, it refers only to TROs issued "without written or oral notice to the adverse party," Fed. R. Civ. P. 65(b)(1), which the Court in this footnote will call an "*ex parte*" TRO (since "*ex parte*" means "on one side only; by or for one party; done for, in behalf of, or on the application of one party only." Black's Law Dict. (6th ed. 1990) p. 76.). Rule 65 prescribes rules for the issuance and duration of an *ex parte* TRO. It does not mention, let alone set any rules for, TROs that are not *ex parte*; to the extent that temporary injunctive relief that is not issued *ex parte* is properly called a TRO, such a TRO is simply not within the scope of Rule 65.

Here, Plaintiffs have provided Defendants "notice of this motion through electronic service." (Doc. No. 3 at 1). In theory, this would mean that Plaintiffs' Motion is not an *ex parte* TRO as contemplated by Rule 65. Nevertheless, the Court will treat Plaintiffs' Motion as properly brought under Fed. R. Civ. P. 65 for two reasons. First, although the Court need not delve herein into how or why this is the case, parties and courts have been known to speak as if a motion can be one for a TRO within the scope of Rule 65 (and not a preliminary injunction, which is governed by other provisions of Rule 65) even if it is made *with* notice to the opposing party. *E.g., In re Reynolds*, No. 23-22086, 2023 WL 11853230, at *3 (Bankr. W.D. Tenn.

For the reasons described below, the Court will (via separate order) **GRANT** the Motion for the reasons and with the caveats set forth herein.



## ASSERTED FACTS[4]

1. Parties[5]

Plaintiff H.H. is "an individual resident of Tennessee." (Doc. No. 1 at ¶ 15; Doc. No. 1-2 at ¶ 2). Plaintiff H.H. is originally from Haiti, and after the 2010 Haiti Earthquake, he was brought to the United States. (Doc. No. 1 at ¶ 1; Doc. No. 1-5 at 2). Plaintiff H.H. "turn[ed] eighteen on November 26, 2025." (Doc. No. 1 at ¶ 26; Doc. No. 1-2 at ¶¶ 1, 3).[6] Plaintiff H.H. "resides with his sister [Plaintiff] Perry." (Doc. No. 1 at ¶ 26; Doc. No. 1-2 at ¶ 2.). Previously, Plaintiff H.H. was legally adopted by Plaintiff Kelli Hewitt and Plaintiff James Hewitt. (Doc. No. 1 at ¶ 27; Doc. No. 1-2 at ¶ 4). Plaintiff H.H. currently has "legal immigration status in the United States," (Doc.

---

Sept. 1, 2023) (A temporary restraining order is a temporary order entered in an action, *often* without notice . . . ."). And second, although Defendants have been put on "notice of the motion through electronic service," (Doc. No. 3 at 1), the Court's decision here comes before Defendants have responded to the Motion and before the Defendants would necessarily would have had a full opportunity to respond to the Motion.

Accordingly, the Court will continue its analysis as if Plaintiffs' Motion is properly brought under Fed. R. Civ. P. 65.

[4] The following asserted facts, unless somehow qualified herein (as for example by "Plaintiffs allege that"), are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are *either:* (1) (a) evidentially supported (typically via an averment one of the declarations) at least to some degree by Plaintiff; and (b) plausible; *or* (2) subject to judicial notice.

In the Asserted Facts section, the Court endeavors to cite first to an allegation of the Complaint where possible, and only after citing the relevant allegation of the Complaint (and quoting therefrom as necessary), then citing the portion of the relevant declaration supporting the cited allegations.

[5] The Court notes that although some of the allegations in the Asserted Facts section are not directly supported by a specific averment in a declaration, the Court accepts these allegations as true for the purposes of the instant Motion either because they are generally supported as being true in the full context of the declarations or because they are subject to judicial notice.

[6] This means, of course, that the events described below occurred while Plaintiff H.H. was a minor.

No. 1 at ¶ 28; Doc. No. 1-3 at ¶ 3), and Plaintiff Kelli Hewitt and Plaintiff James Hewitt "filed a petition for his permanent residency in May 2024." (Doc. No. 1 at ¶ 28; Doc. No. 1-6).

Plaintiff Kelli Hewitt "is an individual resident of Tennessee with a primary residence in Pulaski, Tennessee. She is the mother of [Plaintiff] H.H., . . . as well as the following minors: R.J. (16), W.H. (15), R.M. (13), and B.M. (12)." (Doc. No. 1 at ¶ 16) (stating the age of each minor in parentheses). Plaintiff James Hewitt "is an individual resident of Tennessee with a primary residence in Pulaski, Tennessee. He is the father of [Plaintiff] H.H., . . . as well as the following minors: R.J. [ ], W.H. [ ], R.M. [ ],  and B.M. [ ]." (*Id.* at ¶ 17). Plaintiff Kelli Hewitt and James Hewitt "were arrested on charges of labor trafficking and animal [ ] charges in Giles County, Tennessee," and these "charges stem from allegations not involving [Plaintiff] H.H. or any of their minor children." (*Id.* at ¶ 29). "As a condition of their bond, [Plaintiff Kelli Hewitt and Plaintiff James Hewitt] have been prohibited from having any contact with their children since early July 2024." (*Id.* at ¶ 30).

Plaintiff Perry "is an individual resident of Tennessee with a primary residence in Frankewing, Tennessee. She is currently the caregiver to [Plaintiff] H.H. along with four . . . minor children[, namely] R.J. [ ], W.H. [ ], R.M. [ ], and B.M. [ ]." (*Id.* at ¶ 18).[7] Plaintiff Perry is the daughter of Plaintiff Kelli Hewitt and James Hewitt. (Doc. No. 1 at ¶ 1; Doc. No. 1-5 at 1).

Defendant Quin "is the appointed Commissioner for the Tennessee Department of Children's Services [("DCS")]." (*Id.* at ¶ 19).

---

[7] This allegation is further supported by the Abraham Declaration, which describes "the children"—whom the Court understands to mean Plaintiff H.H., R.J., W.H., R.M., and B.M.—as being in Plaintiff Perry's "care and home." (Doc. No. 1-4 at ¶ 32)

Defendant CLG "is a Tennessee professional corporation with a principal place of business in Brentwood, Tennessee." (*Id.* at ¶ 20). DCS has contracted with Defendant CLG. (*Id.* at ¶ 5).[8]

Defendant Goldstein "is an individual resident of Tennessee." (*Id.* at ¶ 21). He is an attorney at Defendant CLG. (*Id.* at ¶ 35; Doc. No. 1-2 at ¶ 10).

Defendant Heresh "is an individual resident of Tennessee." (Doc. No. 1 at ¶ 22). She is an attorney at Defendant CLG. (*Id.* at ¶ 35; Doc. No. 1-2 at ¶ 10).

2.   Factual Background

a.   *November 10, 2025 Haitian Consulate Meeting*

On November 10, 2025, Plaintiff H.H. "attended a meeting with the Haiti[an] Consulate accompanied by Alexis McDaniel [("McDaniel")], his DCS social worker." (Doc. No. 1 at ¶ 32; Doc. No. 1-2 at ¶ 7). When Consulate staff questioned Plaintiff H.H. "about his upbringing and why his parents were taken from him," McDaniel "interrupted before [Plaintiff H.H.] could answer and directed the Consulate to address their questions to her instead." (Doc. No. 1 at ¶ 32; Doc. No. 1-2 at ¶¶ 8-9)

b.   *November 17 2025 Meeting at Cole Law Group*

On November 17, 2025, "DCS required [Plaintiff] H.H. to attend a meeting with Defendant Andrew Goldstein and Defendant Leen Heresh at the Cole Law Group." (Doc. No. 1 at ¶ 35; Doc. No. 1-2 at ¶ 10). Upon Plaintiff H.H.'s arrival, "immigration papers, identified only as 'JIS forms,' were already laid out on the table, ready for his signature." (Doc. No. 1 at ¶ 36; Doc. No. 1-2 at ¶ 12).[9] At the meeting, Defendant Goldstein and Defendant Heresh "pressure[ed] . . . Plaintiff H.H."

---

[8] Although not explained explicitly in the Complaint, the Court understands that CLG "contracted" with DCS to assist DCS with certain matters, including the matter described herein involving Plaintiff H.H.'s immigration status.

[9] The "JIS forms" at issue here are not defined in the Complaint. Nevertheless, the Court herein will refer to the immigration documents at issue in this action as "JIS forms" for the sake of brevity and consistency.

to sign the JIS forms, "without adequately explaining what they were or allowing him time to read them." (Doc. No. 1 at ¶ 37; No. 1-2 at ¶¶ 12-13). These forms would have required Plaintiff H.H. to "allege parental abuse and neglect to obtain immigration benefits." (Doc. No. 1 at ¶ 75; Doc. No. 1-4 at ¶¶ 7-8). These are allegations that Plaintiff H.H. "does not wish to make," and Plaintiff H.H. "worries that signing the documents will harm his parents." (Doc. No. 1 at ¶ 75; Doc. No. 1-4 at ¶¶ 7-8).

Ultimately, at the November 17, 2025 meeting, Plaintiff H.H. "declined to sign documents he did not understand." (Doc. No. 1 at ¶ 39; Doc. No. 1-2 at ¶ 14).

### c. November 18 2025 Zoom Meeting

On November 18, 2025, a zoom meeting was held between representatives from Litson Law Office (representing Plaintiff Kelli Hewitt and Plaintiff James Hewitt in the criminal case against them), Brent McKamey and McDaniel from DCS, and Plaintiff H.H.'s guardian ad litem Lucy Hensen ("Hensen"). (Doc. No. 1-4 at ¶¶ 15-16). During this meeting, McDaniel informed the representatives from Litson that if Plaintiff H.H. refused to sign the JIS forms, DCS "will consider removing [Plaintiff H.H.] and the . . . four minor children [R.J., W.H., R.M., and B.M.] from [Plaintiff Perry's] care." (*Id.* at ¶ 17).

### d. November 19 2025 Meeting with DCS

On November 19, 2025, Plaintiff H.H. "appeared in court for a hearing," with his sister Ashlee Hewitt. (Doc. No. 1 at ¶ 40; Doc. No. 1-5 at 3). Prior to the hearing, McDaniel and Hensen took Plaintiff H.H "into a private room," excluding Ashlee Hewitt from the meeting. (Doc. No. 1 at ¶¶ 40-41; Doc. No. 1-2 at ¶ 17). There, McDaniel and Hensen pressured Plaintiff H.H. into signing the same JIS forms involved in the November 17, 2025 meeting at CLG. (Doc. No. 1 at ¶¶ 42-44; Doc. No. 1-2 at ¶ 18). McDaniel and Hensen "threatened" that Plaintiff H.H "would be

deported to Haiti if he did not sign the documents." (Doc. No. 1 at ¶ 44; Doc. No. 1-2 at ¶ 20). After multiple requests, Ashlee Hewitt was allowed to rejoin Plaintiff H.H. in the meeting. (Doc. No. 1 at ¶ 45; Doc. No. 1-2 at ¶ 22). Plaintiff H.H. did not sign the documents, but McDaniel told Plaintiff H.H. that "he had until the following morning to make up his mind because another meeting was scheduled with Defendant Goldstein for November 20, 2025." (Doc. No. 1 at ¶¶ 46-47; Doc. No. 1-1 at ¶ 24).

On the evening of November 19, 2025, Hensen called Ashley Abraham ("Abraham"), one of the attorneys from Litson Law Office representing Plaintiff Kelli Hewitt and Plaintiff James Hewitt in the criminal case proceeding against them. (Doc. No. 1 at ¶ 48; Doc. No. 1-4 at ¶ 22). On the call, Hensen requested that Abraham "pressure" Plaintiff H.H. to sign the JIS forms, claiming that they were Plaintiff H.H.'s "only chance to avoid deportation upon turning eighteen." (Doc. No. 1 at ¶ 49; Doc. No. 1-4 at ¶¶ 22-23).

Also on the evening of November 19, 2025, at the request of Plaintiff H.H., Plaintiff Perry and Ashlee Hewitt "contacted immigration attorney Carly Gresham [("Gresham")], who agreed to represent [Plaintiff] H.H. and accompany him to the November 20 meeting at Cole Law Group with Defendant Goldstein." (Doc. No. 1 at ¶ 53; Doc. No. 1-3 at ¶¶ 1-2; Doc. No. 1-2 at ¶¶ 25-26).

### e. *November 20, 2025 Meeting at Cole Law Group*

On November 20, 2025, Plaintiff H.H. arrived at CLG with Gresham "for the scheduled meeting with Defendant Goldstein and Defendant Heresh." (Doc. No. 1 at ¶ 55; Doc. No. 1-2 at ¶ 28). Upon arrival, Defendant Goldstein took Gresham "into a different room, leaving [Plaintiff] H.H. alone." (Doc. No. 1 at ¶ 56; Doc. No. 1-2 at ¶ 30). Defendant Goldstein then told Gresham that "she had to leave and that she was trespassing," then called Brentwood Police to arrest Gresham. (Doc. No. 1 at ¶¶ 57-58; Doc. No. 1-2 at ¶¶ 31-32). "As [CLG] employees began to

force [ ] Gresham out of the building," Plaintiff H.H. "stood up to leave" with Gresham. (Doc. No. 1 at ¶ 59; Doc. No. 1-2 at ¶ 33). However, as Plaintiff H.H. attempted to leave, "Defendant[] Goldstein and [Defendant] Heresh and others blocked the door. Defendant Goldstein physically held the door shut from the outside, preventing H.H. from leaving." (Doc. No. 1 at ¶ 60; Doc. No. 1-2 at ¶ 34 ).

After Gresham was removed, Defendant Heresh "attempted to coerce [Plaintiff] H.H. to sign the [JIS forms]." (Doc. No. 1 at ¶ 66; Doc. No. 1-2 at ¶ 36). Plaintiff H.H. refused to sign the documents "that day." (Doc. No. 1 at ¶ 67; Doc. No. 1-2 at ¶ 37).

> *f.  DCS Plans to Remove Plaintiff H.H., R.J., W.H., R.M., and B.M. From Plaintiff Perry's Home.*

Following the November 20, 2025 meeting at CLG, "DCS set a meeting for Monday, November 24 at 8:30 AM to 'discuss moving the children from the Hewitt-Perry home.'" (Doc. No. 1 at ¶ 69; Doc. No. 1-4 at ¶ 30). Thus, "DCS . . . started the process of removing [Plaintiff H.H., R.J., W.H., R.M., and B.M.] from [Plaintiff Perry's] home" because of Plaintiff H.H.'s refusal to sign the JIS form. (Doc. No. 1 at ¶¶ 71-72; Doc. No. 1-4 at ¶¶ 30-32). McDaniel also informed Abraham of this meeting, characterizing it as "an unplanned placement stability meeting . . . to discuss moving the children from the Hewitt-Perry home." (Doc. No. 1-4 at ¶ 31).

3. <u>Plaintiffs' Claims</u>

Based on the forgoing, Plaintiffs bring four claims.

Count I is a claim under 42 U.S.C. § 1983 ("§ 1983 claim") claim brought by Plaintiff Kelli Hewitt, Plaintiff James Hewitt, and Plaintiff Perry (collectively, "Count I Plaintiffs") against Defendant Quin[10] for violation of their due process rights under the Fourteenth Amendment to the

---

[10] The Court understands that when Plaintiffs refer to Defendant Quin, Plaintiffs are actually referring to Defendant Quin's agents, employees, and staff acting on behalf of her in her official capacity

U.S. Constitution. Via Count I, Plaintiffs allege that the Count I Plaintiffs "have a constitutional right to decisions about the care, custody, and control of Plaintiff H.H, as well as [the] minor children R.J., W.H., R.M., and B.M.," (Doc. No. 1 at ¶ 82), and that Defendant Quin "acting under color of law, seeks to remove [Plaintiff] H.H., R.J., W.H., R.M., and B.M. from the Hewitt-Perry family due to [Plaintiff] H.H.'s refusal to sign a false immigration application." (*Id.* at ¶ 86). Plaintiffs allege that Defendant Quin's "threat of removing Plaintiff H.H. and [the four] minor children R.J., W.H., R.M., and B.M. from Plaintiff [ ] Perry's care [due to] [Plaintiff] H.H.'s refusal to sign a false immigration application violates due process because it furthers no legitimate purpose, much less a compelling governmental interest," (*id.* at ¶ 88), and that such conduct "shocks the conscience and demonstrates [Defendant Quin's (and her staff's, agents' and employees')] deliberate indifference to the violation of Plaintiffs' constitutional right to due process." (*Id.* at ¶ 90). Thus, Plaintiffs allege that Defendant Quin's conduct violated the Count I Plaintiffs' "due process rights to family unity." (*Id.* at ¶ 89).

Count II is also a § 1983 claim against Defendant Quin for violation of due process rights under the Fourteenth Amendment. Unlike Count I, though, Count II is brought by Plaintiff H.H. Via Count II, Plaintiffs allege that "Plaintiff H.H. has a constitutional right to fundamental fairness in proceedings related to his living placement and immigration status," and that "[t]his right protects him from being coerced to sign any documents that affect his immigration status or being removed from his family's care due to his refusal to sign any documents that affect his immigration status." (*Id.* at ¶ 94). In particular, Count II alleges that Defendant Quin "acting under color of law, attempted to coerce Plaintiff H.H. numerous times to sign a false immigration application stating that he was abused and neglected by his parents, Plaintiff[] Kelli Hewitt and [Plaintiff] James Hewitt." (*Id.* at ¶ 96). Count II also alleges that Defendant Quin's "threats to coerce Plaintiff H.H.

to sign a false immigration form violate due process because they further no legitimate purpose, much less a compelling governmental interest," that Defendant Quin's "conduct shocks the conscience and demonstrates [Defendant Quin's (and her staff's, agents' and employees')] deliberate indifference to the violation of Plaintiff H.H.'s constitutional right to due process," and that "[t]hese actions violated Plaintiff H.H.'s rights under the Fourteenth Amendment to the United States Constitution." (*Id.* at ¶¶ 100-02).

Plaintiffs also bring two state law tort claims. One (Count III) is a claim for false imprisonment against Defendant CLG, Defendant Goldstein, and Defendant Heresh. The other (Count IV) is a claim for intentional infliction of emotional distress against Defendant CLG, Defendant Goldstein, and Defendant Heresh.

Via the Motion, Plaintiffs seek an order restraining Defendant Quin[11] "as Commissioner of . . . [the] Tennessee Department of Children's Services, her officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them," (Doc. No. 1-1 at 1-2), from, among other things, "(a) forcing, coercing, or manipulating [Plaintiff] H.H. to sign any immigration documents without the presence of his chosen counsel; (b) threatening [Plaintiff] H.H. with deportation, placement disruption, or any other retaliatory consequences for exercising his legal rights; (c) unlawfully denying [Plaintiff] H.H. access to legal counsel of his choice; (d) falsely imprisoning [Plaintiff] H.H. through physical restraint or preventing him from leaving meetings; and (e) systematically excluding family members or support persons requested by [Plaintiff] H.H. if not otherwise excluded by court order." (Doc. No. 3 at ¶ 7). Beyond this relief,

---

[11] As noted in a footnote above, although the Motion refers to "Defendants" being restrained, Plaintiffs' proposed order (Doc. No. 1-1), makes clear that the relief sought is only against Defendant Quin "as Commissioner of . . . [the] Tennessee Department of Children's Services, her officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them." (Doc. No. 1-1 at 1-2).

Plaintiffs' Proposed Order (Doc. No. 1-1) also includes a provision restraining Defendant Quin (and her agents, employees, and the like) from:

> . . . removing or threatening to remove [Plaintiff] H.H. from his current kinship placement with his sister [Plaintiff Perry], or removing or threatening to remove his minor siblings R.J. (16), W.H. (15), R.M. (13), and B.M. (12), from that same placement, where such removal is based on: (a) his refusal to sign immigration documents without legal counsel; (b) his exercise of his constitutional right to counsel; or (c) his pursuit of this legal action; Defendant[] shall not threaten such removal or separation as a means to coerce [Plaintiff] H.H.'s compliance with their demands regarding immigration paperwork.

(Doc. No. 1-1 at 3-4).

## LEGAL STANDARD

Those seeking a TRO (or, for that matter, a preliminary injunction) must meet four requirements.[12] They must show a likelihood of success on the merits; irreparable harm in the

---

[12] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter.*").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003); *Southern Poverty Law Ctr. v. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV– 1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is

absence of the injunction; the balance of equities favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

Plaintiffs seeking a TRO may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations.[13] *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations;

---

simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the i*ssue* of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equities favors the movant, or the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein. The Court also notes that even in some opinions where the court clearly treats the four items as requirements, the court therein at times refers to them as "factors." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 677 (N.D. Tex. 2016).

[13] When courts refer to this principle, usually it is in connection with a motion for a preliminary injunction rather than a motion for a TRO. But it has been stated in connection with a motion for a TRO, *e.g., Dates v. HSBC*, 721 F. Supp. 3d 616, 624 (S.D. Ohio 2024), and the Court believes that it applies to a motion for a TRO just as it applies to a motion for a preliminary injunction.

*Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for a TRO, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 (S.D.N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the TRO analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts in appropriate circumstances rely on hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

<u>ANALYSIS</u>

As noted, a party seeking grant of a TRO must show: (1) whether the movant has demonstrated a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm in the absence of relief; (3) whether the balance of equities favors the movant; and (4) whether the injunction would serve the public interest. *Winter*, 555 U.S. at 20. In their Motion and Memorandum, Plaintiffs restrict their analysis of the TRO requirements detailed above to Count I and Count II, thus forgoing any reliance on Counts III and IV as grounds for a TRO. The Court will do likewise.

1. <u>Likelihood of Success on the Merits</u>

To obtain a TRO, Plaintiffs must demonstrate that they are likely to succeed on the merits of their claims. *See Winter*, 555 U.S. at 20. The Court finds that Plaintiffs have demonstrated a likelihood of success on the merits on Count I, though not Count II

    a. *Count I*

Via Count I, Plaintiffs bring a claim for violations of the parental due process rights of Plaintiff Kelli Hewitt, Plaintiff James Hewitt, and Plaintiff Perry. Plaintiffs characterize this parental due process right as "the fundamental right of parents to make decisions concerning the care, custody and control of children." (Doc. No. 3-1 at 11) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). Following Plaintiffs and the case law discussed below, the Court will do the same.

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." The Fourteenth Amendment has both a substantive due process component and a procedural due process component. *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996). The substantive due process component "protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988). "When reviewing a substantive due process claim, [a court] must first craft a 'careful description of the asserted right,' *Reno v. Flores*, 507 U.S. 292, 302 (1993), and then determine whether that right is 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty,' such that it can be considered a 'fundamental right.'" *Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

With respect to this parental due process right, Courts have time and again recognized it is a fundamental right. *See e.g., Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) ("It is clearly established that the Constitution recognizes both a protectable procedural due process interest in parenting a child and a substantive fundamental right to raise one's child."); *Cwik v. Dillon*, No. C-1-09-669, 2010 WL 5691404, at *4 (S.D. Ohio Sept. 20, 2010) ("It is well established that the right of a parent to make decisions regarding the care, custody and control of their children is a fundamental right"), *report and recommendation adopted*, No. 1:09-CV-00669, 2011 WL 379039 (S.D. Ohio Feb. 2, 2011); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (describing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"). Accordingly, "the Fourteenth Amendment, through Substantive Due Process, provides parents with a right to make decisions regarding the care, custody, and control of their children." *Ghaith v. Rauschenberger*, 493 Fed. App'x 731, 738 (6th Cir. 2012) (citing *Troxel*, 530 U.S. at 66).

As the Sixth Circuit has noted "available case law suggests that a state actor's conduct affecting this right must 'shock the conscience' to be actionable under § 1983." *Ghaith*, 493 Fed App'x at 738 (citing *Rosenbaum v. Washoe County,* 663 F.3d 1071, 1079 (9th Cir. 2011)). To shock the conscience, "the challenged action" must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Ewolksi v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "[T]he 'shocks the conscience' standard sets a high bar . . .. Conduct shocks the conscience if it violates the decencies of civilized conduct. Such conduct includes actions so brutal and offensive that they do not comport with traditional ideas of fair play and decency." *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (cleaned up). Presumably this standard is intended as an objective one—in that it

asks the adjudicator to determine not whether *his or her* conscience is shocked, but rather whether some hypothetical reasonable person's conscience would be shocked. And yet there is a sense in which this standard is nevertheless subjective and unpredictable,[14] not least because the notion of "shocking" the "conscience" is amorphous and can be perceived by different persons in different ways.[15] *See Kingsley v. Hendrickson*, 744 F.3d 443, 451 (7th Cir. 2014) (referring to the "amorphous 'shocks the conscience' standard"), *vacated on other* grounds, 576 U.S. 389 (2015).

It is also relevant to the "shocks the conscience" inquiry "'whether [a] government actor was pursuing a legitimate governmental purpose[,]' *Range*, 763 F.3d at 589, and whether that interest outweighed the deprivation of the parental liberty interest in this instance." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 767 (6th Cir. 2020) (citing *Kottmyer v. Mass*, 436 F.3d 684, 690 (6th Cir. 2006)). *See also Wells v. Ponder*, No. 4:23-CV-00027, 2025 WL 2599538, at *6 (E.D. Tenn. Sept. 8, 2025) ("In the child removal context, whether a 'government actor was pursuing a legitimate governmental purpose' and 'whether that interest outweighed the deprivation of the

---

[14] For example, one court was faced with the UNIDROIT Principles of International Commercial Contracts ("UNIDROIT Principles"), "a collection of commercial laws that list various internationally recognized defenses to contract claims, including unequal bargaining power." *Singh v. Carnival Corp.*, No. 13-20414-CIV, 2013 WL 12139415, at *4 (S.D. Fla. Mar. 26, 2013), *aff'd*, 550 F. App'x 683 (11th Cir. 2013). Commenting on a reference in the UNIDROIT Principles to "disequilibrium . . . in the circumstances so great as to shock the conscience of a reasonable person," the court aptly noted:

> Of course, a "disequilibrium . . . so great as to shock the conscience of a reasonable person," while clothed in the language of an objective standard, is hardly, in practical application, capable of objective ascertainment across the 148 countries [implicated]. What shocks the conscience in one country is not necessarily the same as what shocks the conscience in another country.

*Id.* at *5.

[15] This is true even for two persons who agree that the conduct at issue was wrongful; one person might conclude that the conduct at issue was shocking to a reasonable person's sensibilities, while another might find the conduct distasteful, alarming, or offensive to a reasonable person's sensibilities but not "shocking" of a reasonable person's "conscience."

parental liberty interest in this instance' are relevant to the inquiry." (quoting *Siefert*, 951 F.3d at 767)).

That is to say, reasonable minds can disagree regarding the application of this standard in a particular case. One jurist might find that a reasonable person's conscience would be shocked by the conduct at issue, while another jurist may find to the contrary. This reality makes the undersigned jurist loath to find at this early juncture that the facts as a matter of law would *not* shock the conscience of a reasonable person.

In part for this reason, the Court finds that Plaintiffs here have shown a likelihood of success (even if it is a bare likelihood) on the merits by pleading and showing through declarations that DCS's or DCS agents' conduct violated the parental due process rights of Plaintiff Kelli Hewitt, Plaintiff James Hewitt, and Plaintiff Perry. Here, according to the factual allegations accepted as true for instant purposes, DCS or DCS agents have threatened to remove Plaintiff H.H. and four minor children (R.J., W.H., R.M., and B.M.) from the home of Plaintiff Perry if Plaintiff H.H. did not sign the JIS forms. (Doc. No. 1 at ¶¶ 5, 71 85, 88, 89; Doc. No. 1-4 at ¶ 17). State officials' use of minors' custody as a bargaining chip to force an individual to sign immigration documents that he has time and again indicated he did not want to sign at least arguably would "shock the conscience" of a reasonable person, especially given the current absence of any indication of a compelling state interest at this juncture to justify DCS's or DCS agents' conduct here. Thus, at this stage, the Court finds that Plaintiffs have demonstrated a bare likelihood of success on the merits as to Count I.

b. *Count II*

With respect to Count II, Plaintiffs bring a claim for a violation of Plaintiff H.H.'s due process right to fundamental fairness. "The Supreme Court has recognized the due process rights

of minors in the adjudicatory stage of the juvenile process." *John L. v. Adams*, 969 F.2d 228, 233 (6th Cir. 1992) (quoting *Germany v. Vance*, 868 F.2d 9, 16 (1st Cir. 1989)). "[T]he applicable due process standard in juvenile proceedings . . . is fundamental fairness." *McKeiver v. Pennsylvania*, 403 U.S. 528, 543 (1971). Fundamental fairness includes affording juveniles "notice of charges, right to counsel, privilege against self-incrimination, right to confrontation and cross-examination." *Schall v. Martin*, 467 U.S. 253, 363 (1984) (citing *In re Gault*, 387 U.S. 1, 31-57 (1967)).

Here, the Court does not find that Plaintiffs have demonstrated a likelihood of success on the merits of Count II. Leaving aside what the Court thinks of what DCS or its agents did or did not do with respect to Plaintiff H.H., the Court does not find that the right to fundamental fairness had yet attached such as to constrain DCS's or its agents' conduct regarding Plaintiff H.H. Based on the record before the Court, the Court cannot yet conclude (by inference or otherwise) that Plaintiff H.H. was in the adjudicatory stage of the juvenile process such as to trigger the right to fundamental fairness. Aside from the November 19, 2025 hearing (the substance of which is not at issue here), no adjudicatory proceeding had been commenced against Plaintiff H.H. Rather, it appears that Plaintiff H.H. instead had a series of meetings with DCS regarding his immigration papers. Standing alone, this is not enough to implicate Plaintiff H.H.'s right to fundamental fairness. Accordingly, Plaintiffs have not shown a likelihood of success on the merits with respect to Count II.

2. Irreparable Harm

Because Plaintiffs have shown a likelihood of success on the merits of one of their claims, Count I, the Court next must examine whether Plaintiffs have shown that irreparable harm will occur absent the requested TRO. *See Winter*, 555 U.S. at 20. Irreparable harm must be "both certain

and immediate," not "speculative or theoretical." *Nacco Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 Fed. App'x 929, 943 (6th Cir. 2007); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

To assess whether Plaintiffs satisfy this requirement, the Court starts by noting why the requirement of irreparable injury exists: "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327.

Here, the Court finds that Plaintiffs have shown that irreparable harm will occur absent a TRO.[16] Absent a TRO, it is likely that DCS or its agents' will continue to try to force Plaintiff "H.H. to sign the [JIS forms]," thereby making "allegations of abuse against his adoptive parents [(Plaintiff Kelli Hewitt and Plaintiff James Hewitt)] that he does not support or believe but that

---

[16] As noted above, the Count I Plaintiffs have demonstrated a likelihood of success on the merits as to their claims in Count I, but Plaintiff H.H. has failed to demonstrate a likelihood of success on the merits as to his claim in Count II. In the discussion that follows, the Court nevertheless discusses harms that would result to Plaintiff H.H. absent a TRO. The Court recognizes that it is uncertain whether the Court is permitted to consider harms to Plaintiff H.H. because Plaintiff H.H. has failed to demonstrate a likelihood of success on the merits as to his claim in Count II. It is generally clear that harm to non-parties is insufficient to demonstrate irreparable harm. *See Great Lakes Higher Edu. Corp. v. Cavazos,* 698 F. Supp. 1464, 1475 (W.D. Wisc. 1988) (stating that the burden to demonstrate irreparable harm "is not satisfied by harm to a third party" (citing *Am. Dairy Queen Corp. v. Brown-Port Co.,* 621 F.2d 255, 259 n.4 (7th Cir. 1980)); *Am. Dairy Queen Corp.* 621 F.2d at 259 n.4 (expressly holding that "'the no adequate remedy at law/irreparable injury' prerequisite is not satisfied by the harm that may befall a nonparty."); *Corral v. Cuyahoga Cnty.,* No. 1:24-CV-1559, 2024 WL 4475458, at *2 (N.D. Ohio Sept. 17) ("A temporary restraining order should not be granted if substantial harm will be caused [only] to others."). It is less certain whether harm to a party that has failed to demonstrate a likelihood of success on the merits of its own claim may nevertheless serve to demonstrate irreparable harm with respect to those parties that *have* demonstrated a likelihood of success on the merits as to *their* claims. However, some case law suggests that harm suffered by parties that have not shown a likelihood of success on the merits of their claims may be used to show irreparable harm with respect to those parties that have demonstrated a likelihood of success on the merits of their claims. *See Jones v. Dist. of Columbia,* 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016) (holding that the "irreparable[-]harm prong of the injunctive[-]relief calculus only concerns harm suffered by the *party or parties* seeking injunctive relief" (emphasis added)); *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,* 48 F.3d 618, 622 (1st Cir. 1995) (finding that demonstrating the irreparable injury element "requires a showing of irreparable harm *to the movant* rather than to one or more third parties."). In light of this case law, the Court at this juncture, while acknowledging that this area of law is uncertain, will consider the harms to Plaintiff H.H. (as a party and movant), as well as the harms to the Count I Plaintiffs, that would result absent a TRO in its analysis of irreparable harm.

could impact their criminal case." (Doc. No. 3-1 at 16). As Plaintiffs argue, the consequence of Plaintiff H.H. signing these JIS forms "once they are submitted to immigration authorities," are "irreparable." (*Id.* at 17) Plaintiff H.H. would be unable to "retract allegations of abuse once they are made under penalty of perjury," or "recover the immigration options he may forfeit by signing documents he does not understand." (*Id.* at 17). Likewise, without the TRO, Plaintiff H.H. likely will feel continued pressure to sign the JIS forms to ensure that he and the four minors may continue to reside with Plaintiff Perry without interference by DCS.

Moreover, the seemingly impending removal of Plaintiff H.H. and four minors from the home of Plaintiff Perry for an indeterminate amount of time as a result of Plaintiff H.H.'s refusal to sign the JIS forms constitutes, at least at this juncture, irreparable harm such as to justify the Court issuing a TRO. *Cf. Gabriel v. Lavison*, No. 2:22-CV-00006-TL, 2022 WL 566601, at *1 (W.D. Wash. Jan. 14, 2022) (finding irreparable harm arising from removal of minor from "habitual residence in Mexico and retaining the child in" Washington state); *Brown v. Jones*, 473 F. Supp. 439, 448 (N.D. Texas) (finding that where plaintiffs stood to lose custody of a child permanently, injury would be "great and immediate.").

Thus, Plaintiffs have satisfied the second requirement necessary for a TRO to issue.

3. Balance of Equities and Whether a TRO Would Serve the Public Interest

A plaintiff seeking a TRO must also establish that the balance of equities tips in his favor and that the TRO is in the public interest. *Winter*, 555 U.S. at 20. Where, as here, the government, or government actors or agents, are the defendants, the "'two remaining . . . factors — whether issuing the [TRO] would harm others and where the public interest lies — merge.'" *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 512 (6th Cir. 2023) (White, J., dissenting) (quoting

*Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)), *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025).

Here, these last two factors also favor the Court granting a TRO. The Court here cannot conclude that issuing a TRO—a TRO that would be in effect for a mere 14 days—would harm Defendants or other third parties or otherwise cut against the public interest. Here, the issuing of a TRO would simply preserve the status quo for 14 days, leaving Plaintiff H.H. and the [four] minor children in place at Plaintiff Perry's residence for the duration of the temporary restraining order, and merely prevent DCS from continuing to pressure Plaintiff H.H. with respect to the JIS forms. *See API Tech. Servs., LLC v. Francis*, No. 4:13-CV-142, 2013 WL 12131381, at *4 (E.D. Va. Dec. 4, 2013) (noting that the purpose of a TRO is to preserve the status quo). Moreover, although the "public has a strong interest in protecting the welfare of all children," *Ferguson v. Cnty. of Los Angeles*, No. LA CV-12-06865-JAK (EX), 2013 WL 12638555, at *2 (C.D. Cal. July 25, 2013), the Court here cannot identify any harm to the welfare of the four minor children if they remain at Plaintiff Perry's residence. Indeed, the Abraham Declaration provides that up until the present dispute, McDaniel and Hensen had informed Abraham that "the children were doing great in [Plaintiff Perry's] care and home." (Doc. No. 1-4 at ¶ 32).

Accordingly, the Court finds that Plaintiffs have established that the balance of equities tips in their favor and that the TRO is in the public interest. *Winter*, 555 U.S. at 20.

Plaintiffs having met, at least at this juncture, the four requirements for the Court to enter a TRO, the Court will enter Plaintiffs' proposed TRO at Docket No. 1-1.

4. <u>Bond Or Security Under Fed. R. Civ. P. 65(c)</u>

Fed. R. Civ. P. 65(c) provides that the "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the Sixth Circuit, "the district court possesses discretion over whether to require the posting of security" when entering a TRO. *ARH v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013).

Here, the Court cannot find a reason to require the posting of a security. The Court, at this juncture, cannot deduce any costs or damages that may result to Defendants as a result of Plaintiffs' proposed TRO. Accordingly, the Court will not require Plaintiffs to post security.

5. Plaintiffs' Requested Hearing

Via the Motion, Plaintiffs also request that the Court "[s]et a hearing on Plaintiffs' request for injunctive relief at the Court's earliest convenience." (Doc. No. 3 at 3). As shown by its analysis above, the Court does not find that a hearing is necessary to determine the merits of Plaintiffs' Motion. Accordingly, the Court will deny as moot Plaintiffs' request for a hearing. To the extent that Plaintiffs later request relief in the form of a preliminary injunction, or to transform the TRO into a preliminary injunction, the Court may grant a request for a hearing on such request if it deems a hearing necessary.

CONCLUSION

Accordingly, for the reasons described herein, Plaintiffs' Motion will be **GRANTED**, with the caveats set forth above (including that the request for a hearing is denied as moot). The Motion will be granted via an order (to be entered separately) substantially in the form of the Proposed Order (Doc. No. 1-1).

IT IS SO ORDERED.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE